UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

ERNESTINE FRY,

        Plaintiff,

        v.                            Case No. 07-C-0927

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

DECISION AND ORDER AFFIRMING THE FINAL DECISION OF THE COMMISSIONER, AND DISMISSING THE ACTION

Ernestine Fry appeals the Social Security Administration's decision to deny her July 29, 2003, application for Disability Insurance Benefits and Supplemental Security Income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 402(e), 1381. On March 23, 2006, an administrative law judge found that Fry's impairments did not allow her to perform the full range of sedentary work, but that there were a significant number of jobs in the economy that she could perform including inspector, packager, and assembler. The Appeals Council granted a request for review under the substantial evidence provision of the Social Security Administration regulations, vacated the hearing decision, and remanded the case to an ALJ to complete the record and issue a new decision.

        In a December 18, 2006, decision, the ALJ found that there were a significant number of jobs that Fry could perform, including 1000 inspection, production, and packaging jobs in Wisconsin. A timely request for review was filed, and denied by the Appeals Council on August 18, 2007.

BACKGROUND

Fry, a 40 year old woman at the time of the decision, had an eighth grade education and past work experience as a nursing assistant and day care worker. (R. 72, 454-55, 460.) The ALJ found that she could not return to work as a nursing assistant or a day care worker. (R. 18.)

At the first hearing February 23, 2006, Fry testified that she was unable to work because of the pain and swelling in her legs from varicose veins and cysts. (R. 450-51.) She testified that she had three major surgeries for the varicose veins and lost feeling in the inner side of her ankles. (R. 450, 456.) Fry testified that she could stand for 15 minutes before feeling a throbbing in her leg from a cyst and then would lay down and prop her feet up. (R. 451.) Although she was able to walk her children to school, she needed to lie down for a couple of hours after walking until the pain stopped. (R. 458.) In addition, Fry testified that doctors removed thyroid tumors from her neck and found acid in her upper intestine. (R. 452.) At that time, Fry had insurance through the State of Wisconsin. (R. 447, 452.)

During that first hearing, Fry testified that she doesn't do anything other than "lay down and read" the Bible all the time. (R. 459.) She does not have company and does nothing socially. (R. 459-466.) Fry is home all day and elevates her legs on a pillow in the bed most of the day. (R. 467.)

At the hearing on September 28, 2006, Fry testified that she had another left leg surgery in April of 2006. (R. 503.) She stays in bed most of the time to reduce her swelling. (R. 504.) When sitting at the kitchen table, Fry elevates both legs on an ottoman. (R. 504.)

2

Medical History

Fry saw Dr. Mario L. Uy at Central Obstetrics & Gynecology on July 15, 2002, and July 25, 2002. (R. 255.) During the first visit, Dr. Uy checked Fry's blood pressure and took a PAP smear. (*Id.*) Later that month, Fry reported numbness in her toes and legs. (*Id.*) Fry called for refills of her medication in October of 2002. (*Id.*)

Fry did not return to Dr. Uy until May of 2003, when the doctor noted that she returned for follow up of her leg pain and hypertension. (R. 254.) On July 3, 2003, Dr. Uy diagnosed varicose veins and recommended exercise, stockings, and medication. (*Id.*) Fry reported leg pain and edema (swelling) on July 31, 2003, and was prescribed medications. (R. 256.)

On July 10, 2003, Fry saw Dr. Douglas Wendland at the Aurora Health Center. (R. 171.) She reported to Dr. Wendland that her pain had resolved but that she remained weak in the left upper extremity. (*Id.*) Fry's sleep was improving and she stated that she was comfortable and in good spirits. (*Id.*) However, she had not returned to any type of work because of her concern about the degree of lifting required. (*Id.*) Dr. Wendland opined that Fry's normal strength perception would return after she resumed more normal activity. (*Id.*) Further, he did not feel that she needed any permanent restrictions but advised that ideally any future employment should involve gradual introduction of heavier lifting. (*Id.*)

On August 28, 2003, Fry returned to Central Obstetrics & Gynecology because she was unable to sleep and was experiencing leg pain. (R. 253.) Dr. Uy continued to diagnose varicose veins and hypertension. (*Id.*) On September 23, 2003, Fry

3

continued to complain of varicose veins and Dr. Uy referred her to Dr. Rolando Mendiola for further varicose vein treatment. (*Id.*)

On October 2, 2003, Fry underwent a Doppler evaluation of her lower extremities ordered by Dr. Mendiola. (R. 257.) The radiologist noted that the test revealed normal ankle/brachial indices bilaterally with no evidence of significant peripheral vascular disease. (R. 257.) Fry returned to Dr. Uy with cough and cold symptoms on December 12, 2003. (R. 251.)

On January 5, 2004, Fry saw Dr. Arlene Braker and indicated that she began experiencing chest wall and left arm pain the year before. (R. 265.) She reported that she had severe left leg pain up to a 10 (with 10 being unbearable pain) everyday. (*Id.*) She reported increased problems with cysts and swelling, and tried TED hose but reported that the area around the stockings would swell. (*Id.*) Fry reported that her left leg was hot all the time and that she was developing lumps in her right leg as well. (*Id.*) Also, she indicated that she had prior varicose vein surgery in 1996, and that she had work restrictions "largely to sit" with her legs up. (R. 266.)

Dr. Braker's examination revealed that Fry had normal range strength in her lower limbs. (R. 266.) Her left foot was somewhat cool and she had numerous small bumps over her pretibial area – more on the left than the right – and "bumps" over the lateral leg. (*Id.*). Dr. Braker ordered tests and gave Fry a trial of medication. (*Id.*)

On February 4, 2004, Dr. Braker explained that a bone scan revealed increased activity in the left proximal fibula - tibia. (R. 264.) Fry's other tests revealed normal ankle branchial indices, normal arterial Doppler studies, and venous Doppler studies that simply revealed evidence of the prior vein stripping. (R. 264.) On examination,

4

Fry had tender nodules over the left tibia and over the left lateral leg, more so than right. (R. 264.) Later in February of 2004, Fry reported continued difficulty with leg swelling. (R. 263.) She had stockings on order. (R. 263.) She reported some benefit from her medication. (R. 263.)

On June 16, 2004, Fry underwent a venous duplex scan of both lower extremities. (R. 297, 345.) Dr. Allan R. Pasch reviewed the scan and concluded that the test was normal with no evidence of deep venous thrombosis and no evidence of varicosities or reflux in the venous system. (*Id.*)

Dr. Uy completed a medical assessment form on June 2, 2004. (R. 337-38.) He diagnosed chronic leg pain, cyst, and bruising in both legs. (*Id.*) Fry's prognosis was "guarded." (*Id.*) Notably, Dr. Uy did not complete the section concerning Fry's ability to lift and carry, or stand, walk, or sit. (*Id.*) He left those questions blank and stated that "she cannot work." (*Id.*) He then added that Fry could not work due to "left leg cyst." (*Id.*) Also, Dr. Uy commented that Fry had pain of both legs all the time. (R. 338.) He wrote "none" in the section that asked about the need for an assistive device for ambulation, a sit/stand option, or other postural limitations. (*Id.*) She did not need any adaptive devices or accommodations. (*Id.*) Without identifying which medication, Dr. Uy indicated that Fry's medications caused a side effect of sleepiness. (*Id.*) Dr. Uy noted that there was no treatment available for Fry's condition. (*Id.*)

On July 19, 2004, Fry underwent a work performance evaluation. (R. 389-93.) Sandra Painter, a therapist, administered the evaluation and wrote a report to Dr. Braker. (R. 391.) Painter explained that, based on testing, Fry was able to perform at the sedentary exertional level as described in the Dictionary of Occupational Titles (DOT).

5

However, Fry exhibited "self-limiting" behaviors that suggested to the therapist that Fry would be best suited for a part time job until she worked her way to a full time position. (R. 389.) Fry was observed clutching her left arm close to her body and, after most tests, she "put her head down" on the table or counter surface. (R. 390.) She participated fully in nine out of fifteen tasks and did not complete the other seven tasks due to her "self-limiting" activity. (R. 389).

On July 28, 2004, Dr. Braker completed a form concerning Fry's work-related accident. (R. 396-97.) Dr. Braker referenced the functional evaluation and listed several permanent restrictions. (*Id.*) In particular, Dr. Braker recommended "primarily seated work." (R. 396.)

On February 19, 2005, Dr. Uy completed another medical assessment form. (R. 335-36.) Dr. Uy explained that he was an OB/GYN specialist and diagnosed pelvic pain and multiple cysts in the veins in Fry's legs. (*Id.*) Fry's prognosis was described as "guarded." (*Id.*) When asked about Fry's ability to lift and carry, stand and walk, and sit, Dr. Uy wrote "no" next to each question. (*Id.*) He then wrote "unable to work" and declined to answer the question that asked whether Fry needed an assistive device or had postural limitations. (*Id.*) He noted that Fry needed accommodations but failed to explain further despite being asked to do so. (*Id.*) Dr. Uy noted that Fry's medications did not cause side effects. (*Id.*)

On May 26, 2006, Dr. David Abelson observed that Fry had varicose veins and had undergone surgery recently to remove some of her veins. (R. 406.) Fry complained of pain, throbbing, and swelling in both legs, and increased pain with standing and walking. (*Id.*)

6

On June 1, 2006, during a psychological evaluation with James J. Paquette, Ph.D., Fry reported difficulties with household chores, citing fatigue and pain as limiting factors. (R. 430.) She did not mention a need to elevate her legs. (*Id.*) In August of 2006, Dr. Abelson noted that Fry had been diagnosed with joint pain and that her prognosis was fair. (R. 418.) Although Dr. Abelson did not give specific restrictions, he noted that Fry could not work until January 31, 2007. (*Id.*)

Medical and Vocational Expert Testimony

James Armentrout, Ph.D., testified as a medical expert at the February 23, 2006, hearing. (R. 61-2, 469-77.) He stated that Fry's mental impairment would not meet or equal a listed impairment. (R. 474.) Moreover, Dr. Armentrout opined that Fry should be limited to routine, low stress, repetitive work. (R. 475.) Also, he determined that Fry should have no public contact and only occasional contact with supervisors and co-workers. (R. 475.)

Beth Hoynik testified as a vocational expert at the September 28, 2006, hearing. (R. 512-18.) The ALJ posed a hypothetical question, asking her to assume an individual of the same age, education, and past work history as Fry. (R. 514.) This individual could perform unskilled sedentary work; have no more than frequent manipulation with the non-dominant arm; and be able to elevate her legs "at will" as well as to a height of six-to-ten inches. (R. 514-15.) There should be no public contact and she should have only occasional contact with her supervisor and co-workers. (R. 514.) Also, the job should not involve any decision making or exercise in judgment that is beyond the mere basics of the job. (*Id.*) And there should be no changes in the job setting. (R. 515.)

The vocational expert testified that 1,000 jobs existed in Wisconsin that such an individual could perform in inspection, production, and packing type work. (R. 515-516.) Fry was represented by Attorney David Turim. (R. 14.)

The ALJ's Decision

In the December 18, 2006, decision, the ALJ determined that Fry was not under a disability, and, therefore, not entitled to benefits. The ALJ followed the five-step analysis, and considered: (1) whether Fry is presently engaged in any substantial gainful activity; (2) whether she has a severe impairment or combination of impairments; (3) whether her impairment meets or equals any impairment listed in the regulations as being so severe as to preclude gainful activity; (4) whether she is unable to perform her past relevant work; and (5) whether she is unable to perform any other work existing in significant numbers in the national economy. A finding of disability requires an affirmative answer at either step three or step five, while a negative answer at any step other than step three precludes a finding of disability. (R. 14-15.)

The ALJ observed that Fry complained of hypertension, esophagitis, degenerative joint disease of the cervical spine, depression, nonspecific chest pain, lower extremity swelling, and hyperthyroidism, and that these were all severe impairments. (R. 15.) However, the ALJ examined the limitations imposed by each of these impairments, and concluded that Fry retains the residual functional capacity to perform sedentary exertional work which involves sitting for six hours in a day, standing for two hours in a day, and lifting ten pounds. Moreover, the ALJ found that Fry needs to avoid public contact, perform work which is unskilled with no decision making, judgment, or changes in the job setting, and occasional supervisor and coworker contact, with no more than frequent

8

manipulation and overhead reaching with her nondominant left arm. (R. 17.) In the previous decision, the ALJ found that the claimant would need work which would allow her to elevate her feet to the height of a pillow placed on the floor. (*Id.*) That limitation remained in effect at the time of the December 18, 2006, decision although the ALJ had little or no evidence that Fry needed to elevate her legs at all. (*Id.*) The ALJ further found that there are a significant number of jobs in the economy which Fry could perform as identified by the vocational expert. Consequently, the ALJ concluded that Fry was not under a disability as defined by the Social Security Act at any time through the date of the decision. (*Id.*)

## CONCLUSIONS OF LAW

Judicial review of a Commissioner's final determination is limited to a determination of whether the findings are supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 852, (1972) *(quoting Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 2d 140 (1938)). An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. *Rice v. Barnhart*, 384 F.3d 363, 368-69 (7th Cir. 2004). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

In her brief, Fry identifies two issues for appeal. First, she argues that the ALJ's decision violates Social Security Ruling 96-8 inasmuch as it did not consider her

9

statement that she needed to elevate her legs to hip level, which would preclude all work. Second, she argues that the ALJ failed in his duty to develop the record in accordance with SSR 96-p by not re-contacting Dr. Mario Uy, a treating physician who opined that Fry was unable to work as a result of the varicose veins and cysts in her legs. (R. 335 - 338.) According to Fry, the ALJ should have requested copies of the medical source records, a new report, or a more detailed report from the medical source.

In making these arguments, Fry refers to various medical records in footnotes that are not contained in the record. For example, Fry notes that the "file does not contain the records from the surgeon and an opinion from him or her as to the permanent restrictions Ms. Fry would have as a result of her varicose veins," and the file does not have an opinion from Dr. Baylon regarding Fry's limitations from the varicose veins and symptoms. (Pl.'s Br. 3, n. 2, 4, n. 4.) In her reply brief, Fry submits that the following "*new and material*" evidence be made part of the record: "Exhibit 1) Medical Examination & Capacity Form completed by J. Baylon, M.D., dated 3/1/06, 2 pages; Exhibit 2) Record from J. Baylon, M.D., dated 2/6/03, 1 page; Exhibit 3) Record from James L. Mahoney M.D., dated 3/31/06, 1 page; Exhibit 4) Records from Muhammad Y. Khan, M.D., dated 4/5/06 to 4/20/06, 3 pages; Exhibit 5) Functional Capacity Evaluation completed by David Abelson, M.D., dated 6/20/06, 2 pages; and Exhibit 6) Records from Key Family Physicians dated 7/13/06 to 9/11/06, 3 pages." (Pl.'s Reply Brief, p. 3.)

A social security claimant bears the burden of supplying adequate records and evidence to prove her claim of disability. *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004). The ALJ has some duty to ensure that the record is fully and fairly developed even when the claimant is represented by counsel because disability proceedings are

10

non-adversarial. *See Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004). However, the ALJ is entitled to assume that a claimant represented by counsel "is making his strongest case for benefits." *Glenn v. Sec'y of Health and Human Servs.*, 814 F.2d 387, 391 (7th Cir.1987); *see also Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007). An omission from the record is significant only if it is prejudicial to the claimant. *See Nelms v. Astrue*, 553 F.3d 1093, 1097-98 (7th Cir. 2009).

Here, where Fry was represented by counsel at both hearings, the ALJ did not fail to fully and fairly develop the record. The ALJ left the record open to collect additional information, and referred to the need for additional materials from the psychologist. (R. 519-20.) All of the information cited by Fry could have been added to the record prior to the ALJ's decision. Moreover, it was not the responsibility of the ALJ to function as counsel, particularly where the medical evidence available to the ALJ provided a sufficient basis for the decision. This is not a case where there are significant gaps in the record.

Further, the medical records now cited by Fry are not inconsistent with the ALJ's findings. Dr. Baylon noted that Fry's prognosis was fair notwithstanding knee pain and varicose veins, and restricted Fry to part-time sedentary work on February 28, 2006, with the restrictions to expire on February 28, 2007. The ALJ's decision was issued on December 18, 2006. (Pl.'s Reply Brief, Ex. 1.) Dr. Mahoney's clinic notes acknowledge that the lumps on both lower extremities below the knee are painful and sore to the point that Fry had trouble walking. Examination revealed that the veins were compressible, there was no evidence of ulceration, no leg edema, and that the examination of the feet

11

demonstrated palpable pulses in the dorsal pedal and posterior tibial arteries bilaterally. However, the plan for treatment states as follows:

> This do [sic] not appear significant enough to be causing the patient's symptoms. I have advised the patient that she wear below-the-knee jobst stockings. A prescription was given to her for two pair. I told her that she would need to wear the stockings before any treatment is recommended. After a period of three months she can be re-evaluated and considered for injections. She would then be seen by one of the other surgeons in my office.

(*Id.*, Ex. 3.) Dr. Khan observed that Fry continued to have pain associated with varicose veins and cysts. (*Id.*, Ex. 4.) Finally, Dr. Abelson restricted her to part-time sedentary work lifting 10 pounds maximum. (*Id.*, Ex. 5.)

To the extent that Fry is seeking a remand pursuant to § 405(g) based on newly discovered evidence, such a remand may be ordered "only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). Fry has made no attempt to show that she meets the sentence six requirements of good cause, having raised the issue in her reply brief. Indeed, Fry only mentions sentence six in the last sentence of the amended request for relief where she states: Plaintiff asks the Court reverse the decision and remand the case for a hearing pursuant to 42 U.S.C. 405(g) (sentence four) or (sentence six).

With respect to Fry's contention that the ALJ did not consider her testimony that she needed to raise her leg to hip level, the ALJ wrote:

> In the previous decision, the undersigned had found that the claimant would need work which would allow her to elevate her feet to the height of a pillow placed on the floor. That limitation also is in effect here although there was little or no medical

12

> evidence in the record indicating that the claimant would be required to elevate her legs at all, much less any higher than this.

(R. 17.) Fry testified that she was supposed to have her legs elevated. When asked who told her that, Fry responded "Dr. Bablyon, Dr. Wii [ph] and Dr. Vaderlon [ph.]." (R. 450.) Fry further testified that she kept her legs propped up on a pillow in her bed for the majority of the day. (R. 467.) Fry's counsel submits that the limitation that her legs be elevated was the directive of Dr. Baylon and Dr. Uy.

The ALJ's statement that there are no medical records to support the limitation is an accurate summary of the record. Dr. Uy, who treated Fry's complaints of leg swelling, prescribed medication and stockings, but never mentioned to Fry the need to stay in bed all day to reduce swelling. (R. 254.) Fry told Dr. Braker that she was restricted to sitting with her legs up but there is no such medical documentation. (R. 265.) Further, Fry told Dr. Braker that her leg was hot all of the time, but Dr. Braker found the left foot to be somewhat cool. In discussing her difficulty with household chores, Fry told Dr. Paquette that it was a result of fatigue and pain rather than having to stay in bed all day with her feet propped up. (R. 430.)

Other records indicate that Fry's October 2003 Doppler evaluation revealed normal results. (R. 257.) Dr. Braker noted bumps and a bone scan revealed increased activity in the left proximal fibula-tibia but the doctor noted that the other tests were normal. (R. 264.) Moreover, in July of 2004, the therapist reported that Fry could work at the sedentary exertional level but not all day. (R. 389.) The therapist did not mention the leg swelling as a limiting factor or one that required accommodation. (*Id.*) Indeed, the therapist observed Fry's "self-limiting" behaviors. (Id.)

13

Having reviewed the record and satisfied that the ALJ based his findings on the treatment history, Fry's self limiting behaviors, and the lack of specific medical orders to keep her legs elevated, this court finds that a reversal or remand is inappropriate on this issue.

Next, Fry claims the ALJ failed to recontact Dr. Ury. The ALJ addressed this as follows:

> The Appeals Council further stated that the hearing decision did not contain an evaluation of the examining source opinion in exhibit 17F by Dr. Mario Uy dated June 2, 2004 and February 17, 2005 indicating that the claimant was unable to work. The undersigned has evaluated these forms and finds that Dr. Uy basically stated nothing other than a absolute conclusion that the claimant was unable to work. There is no analysis provided to back this assertion and thus no way for the undersigned to determine specifically why, in Dr. Uy's opinion, the claimant is unable to work. As the Appeals Council is undoubtedly aware, the conclusion that an individual is "unable to work" is reserved to the Commissioner, not a treating source. The opinion is given no weight because to give it any would be to essentially delegate to this doctor the ultimate determination of whether this claimant is entitled to benefits.

(R. 16.)

An ALJ must re-contact medical sources "only when the evidence received is inadequate to determine whether the claimant is disabled." *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004); 20 C.F.R. § 404.1512(e). Consequently, the court considers whether the medical evidence available to the ALJ provided a sufficient basis for a decision. Because judicial review of administrative decisions is deferential, courts must respect the authority of an ALJ to decide how much evidence is necessary in a given case. *Kendrick v. Shalala*, 998 F.2d 455, 458 (7th Cir. 1993). "Mere conjecture or speculation

14

that additional evidence might have been obtained in the case is insufficient to warrant a remand," *Binion v. Shalala*, 13 F.3d 243, 246 (7th Cir. 1994), particularly where the claimant – not the ALJ – bears the burden of presenting medical evidence of an impairment. *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008); 20 C.F.R. § 404.1512(a).

Here, Dr. Uy authored two assessment forms and did not include any specific restrictions or mention that Fry needed to elevate her legs. In addition, Dr. Wendland, another treating physician, opined in July of 2003 that Fry did not need permanent restrictions and advised that future employment should involve gradual introduction of heavier lifting. (R. 171.) Dr. Wendland believed that normal strength perception would return once Fry resumed more normal activity. (*Id.*) On July 28, 2004, Dr. Braker limited Fry to no pushing or pulling with the left arm, ten pounds lifting and carrying, no overhead work, and primarily seated work. (R. 396.) Finally, Dr. Abelson's medical Examination & Capacity Form, which is a part of the record, indicated that the restrictions imposed on August 11, 2006, would expire on January 30, 2007. Thus, the court is not persuaded that the ALJ needed to solicit a third report from Dr. Uy and that he had the discretion to reject Dr. Uy's opinion as conclusory. Now, therefore,

IT IS ORDERED that the decision of the commissioner is affirmed.

IT IS FURTHER ORDERED that this case is dismissed.

Dated at Milwaukee, Wisconsin, this 19th day of May, 2010.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE